Thara THOMAS, Plaintiff,

v.

EURO RSCG LIFE, Donna Murphy, and Shazzia Khan, Defendants.

No. 09 Civ. 5500(JSR).

United States District Court, S.D. New York.

Sept. 27, 2010.

Andrea Maria Paparella, Liddle & Robinson, LLP, New York, NY, for Plaintiff.

Diane Evelyn Gianos, Bennett Lee Epstein, Foley & Lardner LLP, Chicago, IL, Dana Christina Rundlof, Robert Allen Scher, Foley & Lardner, LLP, New York, NY, for Defendants.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

In her Second Amended Complaint, plaintiff Thara Thomas alleges that defen-

dants Euro RSCG Life ("ERL"), Donna Murphy, and Shazzia Khan discriminated and/or retaliated against her after she took a maternity leave in May 2008, thereby violating the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (Count 1) and that the discrimination and/or retaliation also violated the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.* (Counts 2 and 3) and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–101 *et seq.* (Counts 4 and 5). As a result of events partly occurring after the initial filing of this lawsuit, she also alleges that the defendants constructively discharged her in violation of one or more unspecified laws (Count 6). *See* Second Am. Compl. ¶¶ 125–164.

After discovery was substantially completed, defendants filed for summary judgment in their favor on March 17, 2010. Following extensive briefing and oral argument, the Court issued a "bottom-line" order on July 30, 2010, granting defendants' motion with respect to discrimination claims and denying defendants' motion with respect to retaliation claims. This Memorandum sets forth the reasons for those rulings and clarifies which retaliation claims remain for trial.

The pertinent facts, either undisputed, or, where disputed, taken most favorably to plaintiff (provided they are supported by admissible evidence), are as follows. Thomas was employed as Vice President, Human Resources, by ERL—which provides advertising and communications services to the pharmaceutical and healthcare industry—when she took maternity leave on May 28, 2008 and returned on September 2, 2008. Defendants' Statement of Material Facts 56.1 ("Def. 56.1") ¶¶ 30, 32; Plaintiff's Combined Rule 56.1 Response ("Pl. 56.1 Resp.") ¶¶ 30, 32. Thomas had worked for the company since 2003, Def.

56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7, and had previously taken a maternity leave from November 2005 to February 2006, Def. 56.1 ¶ 16; Pl. 56.1 Resp. ¶ 16. As VP, Human Resources, Thomas handled general human resources issues, and defendant Shazzia Khan, who also held a Vice President title, handled recruiting issues. Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6. Both reported to defendant Murphy. Def. 56.1 ¶ 26; Pl. 56.1 Resp. ¶ 26.

In February, 2009, five months after Thomas's return from maternity leave, ERL engaged in a company-wide reduction in force ("RIF"), because of the downturn in the economy, in the course of which ERL terminated 48 employees. Def. 56.1 ¶ 60; Pl. 56.1 Resp. ¶ 60. Prior to that, in November 2008, Murphy had met with Thomas and Khan to discuss preliminary issues related to the upcoming RIF, at which time Murphy solicited from Thomas suggestions for terminating employees in the Human Resources Department. Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37. Thereafter, at some time between December 15, 2008 and January 15, 2009, Thomas's name was itself temporarily added to the RIF list of employees who might be terminated. *See* Deposition of David Paragamian at 17–22; Deposition of Donna Murphy at 372; Deposition of Thara Thomas at 89, 92–93. On January 27, 2009, Thomas, concerned that she was no longer involved in the RIF planning process and fearing that she might have been added to the termination list, sent Peter Glass (general counsel to ERL) and Murphy an email asserting her belief that their failure to consult her further regarding the RIF was the product of discrimination resulting from her FMLA leave. Def. 56.1 ¶ 74; Pl. 56.1 Resp. ¶ 74.

Very shortly thereafter, on February 2, 2009, Murphy informed Thomas that she would not be terminated as part of the upcoming RIF, and instead, would contin-

ue as VP of Human Resources, but that she would report at least one day per week to ERL's "Catapult" unit in Princeton, NJ. Def. 56.1 ¶¶ 82, 83, 86, 88; Pl. 56.1 Resp. ¶¶ 82, 83, 86, 88. She was also told she would thereafter report to Khan. Def. 56.1 ¶ 84; Pl. 56.1 Resp. ¶ 84. On February 24, 2009, Thomas filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging, *inter alia,* that these changes were effectively a demotion motivated by pregnancy discrimination.

Thereafter, Khan, to whom Thomas was now reporting, informed Thomas that Thomas needed to go to Catapult two days a week. Def. 56.1 ¶¶ 107, 109; Pl. 56.1 Resp. ¶¶ 107, 109. On May 11, 2009, Murphy and Glass met with Thomas and reviewed a list of Thomas's purported performance deficiencies. On June 15, 2009, Thomas filed her initial complaint in this case. On October 16, 2009, Thomas took another FMLA leave and was scheduled to return on December 15, 2009. Def. 56.1 ¶ 156; Pl. 56.1 Resp. ¶ 156. On December 14, 2009, Thomas sent an email to Murphy stating, among other things, that she would not be returning to work on December 15, 2009, believing that ERL had intentionally made her working conditions intolerable so that she was forced to quit. Def. 56.1 ¶ 158; Pl. 56.1 Resp. ¶ 158.

This brief summary does not take account of the welter of inadmissible evidence and irrelevancies that plaintiff has presented to the Court in her voluminous but disorganized and frequently impenetrable papers. Plaintiff's counsel, moreover, has frequently violated the basic rules relating to summary judgment. For example, in her initial filing under Local Rule 56.1 in response to defendants' 56.1 statement, plaintiff, in order to try to dispute certain facts that defendants alleged were undisputed, made certain factual assertions that were unsupported by any-

thing in the record. *See, e.g.,* Pl. 56.1 Resp. ¶¶ 39(1–4, 6–10), 42(1–5). Her "excuse" for doing this, as she later admitted during oral argument, was that she believed that one Joanna Maleszewski, whose deposition had not yet been taken, would testify to these assertions. *See* Transcript ("Tr"), 6/25/2010 at 16–17. In the event, however, Ms. Maleszewski's testimony supported only some of these assertions. Nevertheless, plaintiff then submitted a supplemental Rule 56.1 response ("Pl. Supp. 56.1 Resp.") in which she purported to reference evidentiary support for each of the aforesaid assertions, even where neither Ms. Maleszewski's testimony nor any other fact of record supported many of the assertions.

For example, plaintiff's initial and supplemental 56.1 statements alleged that there was competent evidence that she had more recruiting experience than Khan, *see* Pl. Supp. 56.1 Resp. ¶ 39(8); but the only reference she cited in her supplemental 56.1 statement to support that contention, Ex. 459 (a series of emails Bates stamped 12405–12409), in no way supports that claim. *See* Tr. 6/25/10 at 23–28. Similarly, plaintiff's initial and supplemental 56.1 statements alleged that there was competent evidence that "[a]fter ERL decided to take Thomas off the RIF list, Murphy led a campaign against Thomas to force Thomas to quit or to manufacture false cause to terminate her employment," Pl. 56.1 Resp. ¶ 111(7); but the only references she cited in her supplemental 56.1 statement to support this multifaceted "factual" assertion, *e.g.,* Pl. Supp. Exs. 590, 600–01, 898, again do not remotely support the assertion.

Moreover, in many cases plaintiff's supplemental 56.1 statement did not even try to repair the deficiency in plaintiff's initial 56.1 statement in which it failed (in violation of the rule) to cite any supporting evidence whatsoever for many of the facts

asserted. *See, e.g.,* Pl. Supp. 56.1 Resp. ¶¶ 39(4), 40(1–3), 42(5), 58(27), 59(1), 97(1, 4, 11), 114 (1–21), 121 (9–15), 133(18), 158(7). In view of all this, the Court considered granting defendants' summary judgment motion simply as a response to, and sanction for, plaintiff's blatant deficiencies, of which the foregoing are just illustrative.[1] In the end, however, the Court undertook instead the enormous job of reviewing the entire voluminous proffer from plaintiff's counsel in order to detect the few kernels of wheat hidden in the mass of chaff. From this review, certain conclusions follow:

■ First, plaintiff has failed to come forward with sufficient admissible evidence to establish a prima facie case that defendants discriminated against her because she took pregnancy leave. Pursuant to the FMLA and the regulations promulgated thereunder, "an employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave." 29 C.F.R. § 825.220(c). In *Potenza v. City of New York,* 365 F.3d 165, 168 (2d Cir.2004), the Second Circuit held that the well-known *McDonnell Douglas* burden-shifting framework applies to such claims under the FMLA. *See id.* at 168. To make out a prima facie claim, Thomas must show, even if minimally, that 1) she exercised rights protected under the FMLA; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Defendants argue, in essence, that she cannot satisfy the third and fourth prongs, and the Court agrees.

Plaintiff first contends that Murphy initially decided to terminate or demote Thomas even before she returned from maternity leave in September 2008. But her "evidence" of this consists almost entirely of her (inadmissible) subjective impressions, such as that upon her return from her leave, she "immediately notice[d] that her position and standing had drastically changed." Pl. Mem. Opp. at 17. In terms of admissible evidence, about all she can point to is Murphy's observation that when Thomas was on leave, "the human resources department functioned well if not better than when [Thomas] was present." Pl. Ex. 177, at 5. This lone statement is far too Delphic to evidence, by itself, any intent on Murphy's part to terminate or demote plaintiff. Nor is there any actual evidence of any decision to terminate or demote being taken prior to her return. Indeed, during Thomas's maternity leave, she was given a salary increase, even though the pool for salary increases at this time was quite small and not all employees received one. Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31.

Thomas next argues that, in response to her maternity leave, her responsibilities were diminished when she returned, as evidenced by her exclusion from the ongoing RIF planning. Yet plaintiff's argument is undercut by the fact that in late November or early December, Murphy included Thomas in various discussions of the RIF and asked her to provide input on who from the Human Resources Department should be terminated. Def. Ex. 2, Deposition of Thara Thomas at 182–183. While there was a brief period when Thomas was, logically, excluded from the

---

1. Even while seemingly oblivious to her own violations of the rules, plaintiff's counsel took an extremely aggressive posture with respect to legitimate requests from defense counsel. For example, plaintiff's counsel, and plaintiff herself, objected vehemently to defense counsel's request to adjourn the trial six months so that he could receive needed chemotherapy: This, despite the fact that plaintiff's counsel simultaneously claimed that she needed more time for pre-trial discovery.

RIF planning while ERL was considering whether Thomas herself should be terminated, once it was decided not to terminate her she resumed a role in the RIF and took part in terminating other employees as part of the RIF process. *See* Def. 56.1 ¶ 87; Pl. 56.1 Resp. ¶ 87.

As for plaintiff's being temporarily placed on the RIF putative termination list (along with many others), mere placement on this list is not sufficient to make out a prima facie case of adverse action, since the list was kept confidential and Thomas was soon removed from the list and not terminated. (Moreover, even assuming, contrary to fact, that it were sufficient for this prima facie purpose, defendants have adduced competent evidence that Thomas was placed on the RIF list primarily for economic and performance-based reasons, and plaintiff has failed to come forward with competent evidence from which a reasonable fact-finder could find that this was pretextual.) Further still, the tentative decision to add her to the termination list occurred nearly five months after the end of Thomas's leave, thus negating, in the absence of other evidence of intent, any inference that she was added to the list because she had taken the pregnancy leave. *See Chamberlin v. Principi,* 247 Fed.Appx. 251, 254 (2d Cir.2007) (no causation following five-month interval).

Thomas also asserts that the "promotion" of Shazzia Khan some time prior to February, 2009 was a discriminatory act, because she (Thomas) was better qualified. However, Thomas has failed to adduce any competent evidence that Thomas's qualifications were so superior that any reasonable factfinder would find that ERL's business decision to promote Khan and not Thomas was rooted in discriminatory animus. *See Byrnie v. Town of Cromwell Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir.2001). Nor has Thomas adduced any competent evidence whatsoever remotely suggesting that Khan's promotion in preference to Thomas was motivated by pregnancy discrimination.

Without multiplying examples further, the point is that Thomas, despite the prolix nature of her allegations, has failed to come forth with admissible evidence making out even a prima facie case of her claims of pregnancy discrimination, whether under the FMLA, the NYSHRL, or even the more liberal standards of the NYCHRL. *See, e.g., Williams v. New York City Housing Auth.,* 61 A.D.3d 62, 66–67, 872 N.Y.S.2d 27 (N.Y.App. Div. 1st Dep't 2009); *Winston v. Verizon Servs. Corp.,* 633 F.Supp.2d 42, 49 (S.D.N.Y.2009) (N.Y.CHRL does not alter the "kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56.").[2]

The same can almost, but not quite, be said of plaintiff's claims of retaliation, *i.e.,* her claims that she suffered adverse employment actions in retaliation for the email she sent on January 27, 2009, complaining of pregnancy discrimination and/or the similar but more expansive claim she filed with the EEOC on February 24, 2009.

Most of what Thomas complains of here in fact occurred prior to her January 27

---

**2.** As noted, plaintiff also alleges a free-floating "constructive discharge" claim (Count 6). Aside from the failure to cite to any statutory violation to which she attaches this claim in even her third pleading (*i.e.,* the Second Amended Complaint), plaintiff has failed to demonstrate that ERL made her working conditions so intolerable that a reasonable person in those circumstances would feel forced into an involuntary resignation. *See Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir. 1983); *see also Stetson v. NYNEX Service Co.,* 995 F.2d 355, 360 (2d Cir.1993); *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1156–58 (2d Cir.1993).

email. For example, although Thomas was not advised that she would report to Khan until February 2, 2009, the competent evidence of record all supports the conclusion that the decision to promote Khan occurred well before Thomas sent her email. *See, e.g.*, Def. 56.1 ¶ 70; Pl Counter 56.1 ¶ 70(5) (citing Pl. Ex. 144).

Other alleged instances of retaliation are, at best, immaterial. For example, although Thomas alleges that, following her complaint there was enhanced scrutiny of her business travel, she also admits that there was a legitimate business reason for having her indicate what days and times she would report to Catapult, which was the main alleged form of such "monitoring". Def. 56.1 ¶ 147; Pl. 56.1 Resp. ¶ 147; *see also Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 247–48 (S.D.N.Y.2001). Under such circumstances, such scrutiny cannot remotely support a claim of retaliation.

Thomas also alleges that the mere fact that she did not receive a salary increase and bonus in 2009 was an act of retaliation. Yet, Thomas does not deny that in 2009 only 20 employees, as opposed to hundreds in years prior, received a salary increase or bonus, due to the very same economic circumstances that led to the effectuation of the RIF. *See, e.g.*, Def. 56.1 ¶ 52; Pl. 56.1 Resp. ¶ 52. The record also indicates that she did not perform as expected on several assignments.

Nor is there any material evidence that the series of complaints against Thomas written by Vanessa Mannino on April 9, 2009 were caused, even inferentially, by Thomas's January 29, 2009 email or her February 24, 2009 EEOC complaint.

Without multiplying examples further, the Court concludes that the only instances of conduct that arguably support Thomas's claims of retaliation—if barely—are the decisions to send her to Catapult. The decision to send Thomas to Catapult once per week was made just days after her complaint of discrimination on January 29, 2009, *see* Def. 56.1 ¶ 83; Pl. 56.1 Resp. ¶ 83, and the decision to send her to Catapult twice a week was made just days after she filed her EEOC complaint on February 24, 2009. *See* Pl. 56.1 Resp. ¶ 75(19) (citing Pl. Ex. 1, at 156:22–23). Given the very modest showing required for making out a prima facie case of retaliation, this may be sufficient.

Moreover, if, under the *McDonnell Douglas* burden shifting approach, one then considers defendants' proffered justification, there is sufficient evidence in the record from which a reasonable factfinder could conclude that the justifications advanced by defendants are pretextual. For example, although defendants argue that Thomas was sent to Catapult at the request of Jeffrey Hoffman (President of Catapult) because the person who otherwise provided human resources support at Catapult, Joanna Maleszewski, was "stretched too thin," Maleszewski testified at her deposition that Hoffman and Pat Chenot (Catapult's Chief Operations Officer) both stated that Murphy was responsible for the decision to send Thomas to Catapult and that both expressed surprise that Maleszewski was being transitioned out of Catapult. *See* Affirmation of Robert A. Scher in Support of Reply Memorandum of Law and Supplemental Memorandum of Law, Ex. A, Deposition of Joanna Maleszewski, at 93–95. Although there are also disputed issues of fact as to whether Thomas's once-a-week and/or twice-a-week transfers to Catapult could be considered materially adverse actions, still, taking the facts of record most favorably to plaintiff, the Court concludes that the retaliation claims—as limited to the sole issue of these transfers to Catapult—survive summary judgment.

Accordingly, the Court hereby confirms its prior order granting summary judgment dismissing the discrimination claims (Counts 2 and 4 and the part of Count 1 that alleges discrimination) and the constructive discharge claim (Count 6), but denying summary judgment as to the retaliation claims (Counts 3 and 5 and the part of Count 1 that alleges retaliation). The Court further specifies, however, that the remaining retaliation claims are limited to the decisions to send Thomas to Catapult and are otherwise dismissed. The parties are further reminded that trial of the remaining claims will commence promptly at 9:00 A.M. on December 6, 2010. Finally, the Clerk of the Court is directed to close document number 52 on the docket of the case.

SO ORDERED.